UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MELINDA and RICHARD ARMSTRONG, individually and as the natural parents and guardians of R.W.A., a minor child,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant, | Case No. 1:13-cv-00163-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Before the Court is the United States' Motion to Dismiss (Dkt. 17). The Court heard oral argument on November 12, 2014, and now issues its decision. For the reasons set forth below, the Court will grant the motion and dismiss the action.

## BACKGROUND

On September 5, 2010, Plaintiffs and their three children were camping in the Emmett Ranger District within the Boise National Forest, in an area known as "Tamarack

Flat." *Highfill Dec.* ¶ 13, Dkt. 17-27. On the morning of September 5, Plaintiffs' son R.W.A. was sitting by the fire ring when a tree fell and pinned him to the ground. *Armstrong Depo.* 81:14-20, Dkt. 18-12. The boy was transported out of the forest by helicopter and taken to Saint Al's hospital to treat severe injuries to his leg and chest. *Id.* at 84:2-22, 92:2-7.

In 2005 – roughly five years before R.W.A. was injured – the United States Forest Service had inventoried dispersed campsites[1] in the Emmett Ranger District in connection with a project known as the "Third Pole Project." *See Erickson Depo.* 21:12-22:18, Dkt. 18-4. The purpose of the Third Pole Project was to improve watershed conditions. *Id.* at 93:4-5; *see also Mar. 13, 2006 Letter from District Ranger John Erickson to John Robison,* Dkt. 18-19, at 1. As part of this project, rangers inventoried dispersed campsites to study what impact these sites were having upon water quality and riparian function. *See Erickson Depo.* 86:13 to 89:5 & 92:23 to 93:14, Dkt. 18-14.

The rangers who inventoried the dispersed campsites used an inventory sheet containing various line items to document their findings for each site. The sheet included a line item for identifying hazard trees. *Pl. Ex. G* at 2, *inventory item* 31, Dkt. 18-8. For

---

[1] According to an April 1998 Boise National Forest report, "[a] dispersed site is defined as any undeveloped Forest site modified by a recreationist. This includes both camping sites and day use-only sites, such as water access sites, picnic areas, and undeveloped trailheads. Such modifications include the presence of a fire ring or a reduction in vegetation as a result of human usage." *April 1998 Boise National Forest Report: Dispersed Recreation Site Condition Inventory and Mapping Project Report*, Dkt. 19-8, at 3, ¶ A.

**MEMORANDUM DECISION AND ORDER - 2**

purposes of the inventory, a hazard tree was defined as "[a]ny potential tree failure due to a structural defect that may result in property damage or personal injury." *Gov. Ex. NW-13* at 11, Dkt. 19-8. Significantly, however, the Third Pole Project did not contain any directives on what the forest planned to do with any hazard trees that it did identify in these campgrounds.

Ranger Linda Bryant inventoried the campsite where the Armstrong family later camped. During that 2005 inventory, Bryant did not identify the tree that fell upon R.W.A. as a "hazard tree." *Bryant Depo.* 30:20-21, Dkt. 18-2; *Pl. Ex. P* at 2-3, Dkt. 18-9. The day after R.W.A. was injured, however, Ranger Bryant again inspected the tree again and determined that the tree was dead and had a decaying root system. *Bryant Depo.* 95:8-20, Dkt. 18-2. Bryant indicated that had the tree still been standing, it would have been classified as the highest risk of hazard tree. *Id.* at 96:9-17. It is estimated that prior to falling on September 5, 2010, the tree had been standing dead for somewhere between 10 to 25 years. *DeNitto Depo.* 14:5-24, Dkt. 18-10; *Guyon Depo.* 41:9-18, Dkt. 18-11.

In April 2013, the Armstrongs sued the United States for negligence and "negligent and/or intentional infliction of emotional distress." *See Compl.* at 9, Dkt. 1. The government moved to dismiss on the ground that this Court lacks subject matter jurisdiction under the discretionary function exception to the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(a).

## LEGAL STANDARD

A defendant may move to dismiss a complaint for lack of subject matter

jurisdiction pursuant to Rule 12(b)(1) in one of two ways. *See Thornhill Publ'g Co., Inc. v. General Tel. & Elec. Corp.,* 594 F.2d 730, 733 (9th Cir. 1979)). The attack may be a "facial" one where the defendant attacks the sufficiency of the allegations supporting subject matter jurisdiction. *Id.* On the other hand, the defendant may instead launch a "factual" attack, "attacking the existence of subject matter jurisdiction in fact." *Id.* A "factual" attack may be accompanied by extrinsic evidence. *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir. 1989); *Trentacosta v. Frontier Pac. Aircraft Indus.,* 813 F.2d 1553, 1558 (9th Cir. 1987). "[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims ." *Thornhill,* 594 F.2d at 733. A plaintiff must then come forward with evidence outside the pleadings to support his jurisdictional allegations. *Trentacosta,* 813 F.2d 1558.

However, "[t]he relatively expansive standards of a 12(b)(1) motion are not appropriate for determining jurisdiction [pursuant to a "factual attack"] ... where issues of jurisdiction and substance are intertwined. A court may not resolve genuinely disputed facts where the question of jurisdiction is dependent on the resolution of factual issues going to the merits." *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir. 1987) (internal quotations omitted).

To the extent the issues become so intertwined, the summary judgment standard comes into play. Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## ANALYSIS

The Federal Tort Claims Act (FTCA) waived the United States' sovereign immunity for tort claims arising out of negligent conduct of its employees acting within the scope of their employment. *Terbush v. United States,* 516 F.3d 1125, 1128 (9th Cir. 2008). Thus, the government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). There are various exceptions to this immunity, including the discretionary function exception.

The discretionary function exception restores sovereign immunity to the government when the plaintiff's claim "is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abuse." 28 U.S.C. § 2680(a). "In this way, the discretionary function exception serves to insulate certain governmental decision-making from judicial second guessing of

legislative and administrative decisions grounded in social, economic, and political policy through the median of an action in tort." *Terbush*, 516 F.3d at 1129 (internal quotation marks and citation omitted).

Whether the exception applies is a question of law for the Court to decide. *See Kelly v. United States.*, 241 F.3d 755, 759 (9th Cir. 2001). The burden of proving the exception is on the United States. *See Marlys Bear Medicine v. United States Dept. of Interior*, 241 F.3d 1208 (9th Cir. 2001). As a remedial statute, the FTCA "should be construed liberally, and its exceptions should be read narrowly." *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002).

In a series of cases, the Supreme Court has articulated and refined a two-part test to determine whether the discretionary function exception applies. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *Berkowitz v. United States,* 486 U.S. 531, 536-37 (1988). First, the Court must determine whether a federal statute, regulation or policy prescribed a specific course of action, meaning that the decision as to whether to take action (or not take action) was not within an agent's discretion. *Gaubert,* 499 U.S. at 322-23. If there is such a statute, regulation, or policy, the inquiry ends; the plaintiff can indeed pursue a negligence action because the government had no rightful element of discretion. *Terbush,* 516 F.3d at 1129.

If however, the challenged action or decision was discretionary, the Court proceeds to the second step, which asks whether the action taken or the decision made "is of the kind that the discretionary function exception was designed to shield – namely,

actions and decisions grounded in social, economic, or political policy. *Id.*

Before undertaking this two-part inquiry, the Court must first identify the specific action or omission plaintiffs are challenging. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002); *Autery v. United States*, 992 F.2d 1523, 1527-28 (11th Cir. 1993). Stated simply, the plaintiffs are challenging the government's failure to (1) inspect and identify a dead tree snag in the Tamarack Flat dispersed campsite, (2) mitigate the tree snag in some way, either by removing the snag, closing the campground, or warning users about it, and (3) train employees to identify hazardous trees at dispersed campsites. Plaintiffs say that the government was required to take these actions based on various provisions contained in United States Forest Service Manuals and Handbooks. Plaintiffs also generally argue that the Third Pole Project described above created mandatory duties to identify the tree snag and mitigate dangers associated with it. Ultimately, then, the Court must first decide whether any statute, regulation, or administrative policy required the government to identify or mitigate tree hazards in dispersed campsites in any specific manner.

1. **Step One: Was the Complained-of Conduct Mandatory or Discretionary?**

The Court will first address plaintiff's arguments related to the Forest Service Manuals and Handbooks. The threshold problem with plaintiff's arguments related to these manuals and handbooks is that none of the cited provisions apply to dispersed campsites. Rather, these provisions contain directives for either developed campsites or forest roads.

### A. Forest Service Manual 2300 – Developed Campsites

Plaintiffs first point to Forest Service Manual 2300, which deals with "Recreation, Wilderness, and Related Resource Management." More specifically, plaintiffs look to Chapter 2330 of this manual, which contains the following provisions related to public safety and tree hazards:

> **2332.1 - Public Safety**
> To the extent practicable, eliminate safety hazards from *developed recreation sites*. Inspect each public recreation site annually before the beginning of the managed-use season. Maintain a record of the inspections and corrective actions taken with a copy of the operation and maintenance plan. Immediately correct high-priority hazards that develop or are identified during the operating season or close the site.
>
> **2332.11 - Tree Hazards**
> Consistent with preserving the recreation resource, remove trees or tree limbs identified as hazardous *at developed recreation sites*. Obtain assistance from timber management, forest pest management, and recreation specialists, as necessary.
>
> **2332.12 - Other Natural Hazards**
> If practicable, correct known natural hazards *when a site is developed and open for public use*. If the hazards remain or new natural hazards are identified, take steps to protect the public from the hazards. Tailor the action taken to each hazardous situation. Consider posting signs, installing barriers, or, if necessary, closing the site to address concerns of public safety.

FSM 2332.1, 2332.11, 2332.12 (emphasis added).

As shown by the emphasized language, the provisions relating to removal tree hazards are directed to "*developed*" recreation sites.

The United States has presented evidence that the Tamarack Flat campsite is not a "developed" recreation site within the meaning of these provisions. *See Seesholtz Depo.* 36:20-38:24, Dkt 17-7. Prior to 2010, there were 45 developed recreation sites and

facilities on the Emmett Ranger district, including 19 campgrounds. *Highfill Dec.* ¶ 12. The Forest Service has not, at any time, identified, listed, managed or maintained the Tamarack Flat campsite as one of the 45 designated recreation sites on the Emmett Ranger District of the Boise National Forest. *See Highfill Dec.* ¶ 13, Dkt. 17-27. In fact, the Forest Service has never considered any area in Tamarack Flat as being a developed recreation site because the Forest Service had not invested in any recreational facilities. *Id.* The campsite at issue in this case was simply a cleared area with an access road and fire ring, and was classified by the Forest Service as a dispersed campsite. *Bryant Depo.* 54: 6-10, Dkt. 18-2. None of the "improvements" at the campsite were made by the Forest Service. *Id* at 73:24-74:18, 100:23-101:23; *Erickson Depo.* 26:20-32:3, Dkt 18-4 (stating that campsite was dispersed because the Forest Service had not made any improvements); *Gov. Ex. NW-13*, Dkt. 19-8 (dispersed site is defined as any undeveloped Forest site *modified by a recreationalist*) (emphasis added). Plaintiffs do not rebut this or present reasons why the Court should not defer to the agency's interpretation.

Plaintiffs argue that, despite this, the Tamarack Flats campsite at issue is a "developed" campsite because Chapter 2330 of the Forest Service Manual indicates that the Forest Service will develop various categories of campgrounds – including primitive sites. *See Pl. Response* at 12, Dkt. 18. Plaintiffs suggest that the Tamarack Flats site – which, as noted, included an access road and a fire ring – falls within the more primitive definitions. *See Ex. 01 to FSM 2330.3* (table classifying the "class" of recreation opportunity by the level of "side modification"). Thus, according to the plaintiffs, the

directives spelled out in Forest Service Manual chapter 2330 apply to the Tamarack Flats campsite at issue, even though it is a more primitive site.

There are two problems with this argument.

First, as noted above, the United States presented undisputed evidence that "[p]rior to September 2010, the Forest Service had not invested in any recreation facilities or management of this area [Tamarack Flat]." *Highfill Dec.* ¶ 13. Further, "[t]he fire ring and road . . . were not designed, created, managed, installed, or maintained by the Forest Service – either for the comfort and convenience of the public or for resource protection." *Id.* Thus, even assuming that the campsite at issue could theoretically be defined as a "developed recreation site," the Forest Service had not developed the site at all – not even as a primitive site. Rather, based on the evidence presented, the Court concludes that the site was modified by recreationists, which is consistent with the definition of a dispersed campsite.

The second problem with the plaintiff's argument is that various other regulations indicate that a "developed campsite" is something more than the primitive or semi-primitive campgrounds referred to in the Forest Service Manual. As explained in the Federal Register, a developed recreation site requires a "concentration of facilities" evidencing a "significant investment" by the Forest Service. 71 Fed. Reg.29288-01, 29291(May 22, 2006). Where the Forest Service has made no improvements to a site, there is no concentration of facilities evidencing a significant investment.

The Court finds that the Forest Service has never considered the campsite at issue

to be a developed recreation site, and that interpretation is reasonable because the Forest Service had made no improvements to the campsite. Forest Service Manual 2332.1 and 2332.11-12 (block-quoted above), therefore, do not apply.[2]

### B. Forest Service Handbook 7709.59 – National Forest Service Roads

Plaintiffs also rely on Forest Service Manual 7700, which relates to "Travel Management," as well as Forest Service Handbook 7709.59. In particular, plaintiffs focus on sections regarding training, arguing that various provisions required the government to train employees to identify hazard trees.

But the relevant provisions are specifically limited to National Forest Service roads. For example, Forest Service Handbook 7709.59.41.7.2, regarding identification and correction of "danger trees," is specifically limited to "[d]anger tree hazards on roads." *Id.* at 41.7.2. ("Danger trees *on roads* will be prioritized by high, medium, and low categories.") (emphasis added). And Forest Service Manual 7733.04b generally states that regional foresters are responsible for "ensur[ing] that training guidelines are developed for personnel to acquire and maintain the necessary skills to implement Forest Service safety measures *on NFS roads*." (emphasis added). Similarly, the Forest Service Handbook indicates that forest supervisors are responsible: "1. To ensure that a qualified person is available to assess danger trees *along NFS roads* and to recommend mitigation

---

[2] Because the Court found that these provisions do not apply, the Court will not address whether the duty created under these provisions is mandatory.

for hazards associated with trees so identified. 2. To ensure that *road segments* identified as having high priority danger trees are closed to public use until hazards are mitigated." FSH 7709.59.40.4b(2).

In this case, the tree at issue was 28 feet tall, and stood 50 feet from Forest Service Road 607. *See Alexander Dec.* ¶ 25, Dkt. 17-10. And although the Tamarack Flat campsite was generally accessible by Road 607, the United States presented evidence that the access road into the campsite was not a National Forest Service road. *Id.* ¶ 26. Finally, the United States has presented evidence that due to the trees' size, distance, and downward location from NFS 607, the tree would not be considered or identified as a hazard tree under Forest Service Handbook 7707.59.41.7. *Id.* ¶ 32; *Alexander Depo.* 73:8-73:20, Dkt 17-3.

The Plaintiffs have provided no evidence to rebut these facts. As a result, the Court finds that the tree at issue never posed a risk to a NFS road, and, therefore, the cited provisions of the Forest Service Manuals and Handbooks did not create a mandatory duty to investigate the campsite for hazard trees, or to train employees to identify hazardous trees at such campsites. In short, the sections of the Forest Service handbooks and manuals related to roads have no bearing here.

### C. The Third Pole Project

Finally, plaintiffs say that the 2005 Third Pole Project described above created mandatory duties. Plaintiffs advance a two-step argument here. First, they say that the government was required to inventory dispersed campsites. *See Response Br.* at 15, Dkt.

18 ("the Forest Service is also liable in tort because it undertook a non-discretionary inventory of campsites. . . ."). Second, plaintiffs suggest that the act of identifying a hazardous tree during this inventory triggered a mandatory duty to "remediate" such trees. *See id.*

The Court is not persuaded at either step. First, as already noted above, plaintiff has not identified any federal statute, regulation or policy specifically requiring the Forest Service to inventory dispersed campsites for tree hazards or otherwise. Rather, the evidence shows that in undertaking the Third Pole Project, the Forest Service inventoried the campgrounds for the purpose of improving the watershed. Second, contrary to plaintiffs' suggestion, there is no evidence that the Third Pole Project contained any mandate requiring the government to take some specific action if a ranger did, in fact, identify a hazard tree during the inventory.

In conclusion, after reviewing the various provisions of the Forest Service Manuals and Handbooks, as well as the government's Third Pole Project, the Court has not located any federal statute, regulation or policy that required the government to identify, remove, or warn users about hazardous trees in dispersed campsites.

**2.      Step Two: Did Congress Intend to Protect the Complained-of Conduct?**

The second question under the Supreme Court's two-part test is whether the conduct or decision at issue – *i.e.*, identifying and managing hazardous trees in dispersed campsites – is the sort of conduct or decision the discretionary function exception was intended to shield. *See Gaubert*, 499 U.S. at 322-23. The Court finds that it is.

Decisions involving whether and how to identify and remove or otherwise manage hazardous trees in dispersed campsites throughout the Boise National Forest plainly are typically policy-driven matters. Among other things, in making these sorts of decisions, the government must balance safety concerns, wildlife and ecosystem preservation, and recreational uses – all while working within a limited budget.

Other courts have reached similar conclusions.[3] *See, e.g., Merando v. United States,* 517 F.3d 160, 172 (3d Cir. 2008); *Autery v. United States,* 992 F.2d 1523, 1531 (11th Cir. 1993); *Hatcher v. United States,* 512 Fed. Appx. 527, 530 (6th Cir. 2013) (unpublished decision) ("tree inspection and removal is the sort of conduct inherently subject to important and unpredictable constraints like limited funds and manpower"). In *Autery v. United States,* 992 F.2d 1523, 1531 (11th Cir. 1993), for example, the Eleventh

---

[3] The Ninth Circuit has dealt with hazardous tree cases in two unpublished decisions. In *Moyer v. Washington State,* 106 F.3d 408 (9th Cir. 1997) (unpublished table decision), the Ninth Circuit concluded that hazardous-tree removal decisions on a roadway in a National Forest were policy-based, and thus protected by the discretionary function exception. As the court explained, "The Forest Service was required to consider not only highway safety, but other factors, including: the preservation of the old-growth forest lining the roadway; protection of the Spotted Owl, which resides in the forest; and the various recreational uses of the forest." *Id.* at 409.

More recently, in *Fernandez v. United States,* 496 Fed. Appx. 704 (9th Cir. 2012) (unpublished decision), the Ninth Circuit held that failure to remove a previously identified hazardous tree was *not* susceptible to a policy analysis. *Id.* at 705. *Fernandez* is distinguishable, however, because in that case, the court concluded (at the first step of the *Berkowitz* analysis) that identification of a hazardous tree "trigger[ed] a mandatory provision" requiring the Forest Service to dispose of the tree as promptly as possible. Thus, at the second step of the *Berkowitz* analysis, the court concluded that removing the previously identified hazardous tree was merely the implementation of a decision regarding safety or routine maintenance that did not involve weighing policies. In this case, however, there was no mandate to remove any previously identified hazardous tree, except along forest roads. As discussed above, that exception does not apply here.

Circuit explained that in deciding "on a method of inspecting potentially hazardous trees, and in carrying out the plan, the Park Service likely had to determine and weigh the risk of harm from trees in various locations, the need for other safety programs, the extent to which the natural state of the forest should be preserved, and the limited financial and human resources available." Similarly, in *Merando v. United States,* 517 F.3d 160, 172 (3d Cir. 2008), the Third Circuit stated that in choosing whether and how to investigate hazardous trees, the government must "consider how best to use its limited financial and human resources in a manner that balance[s] visitor safety with visitor enjoyment and conservation of the Park."

Plaintiffs are arguing that the government should have recognized and addressed the hazard in connection with conduct surrounding the Third Pole Project. Specifically, plaintiffs rely on *Summers v. United States*, 905 F.2d 1212 (9th Cir. 1990), for the proposition that, had the tree been identified as a hazard, the failure to warn potential campers of tree hazards would not implicate policy considerations. *Pl. Response* at 19-20, Dkt. 18. The Court finds the Ninth Circuit's reasoning in *Terbush v. United States,* 516 F.3d 1125 (9th Cir. 2008) instructive on this point:

> "[T]he decision cannot be boiled down to a simple recognition of the existence of some hazard. The entire process, including identifying hazards, determining which hazards require a warning, and determining how and when and where the warning should proceed, involves discretion." … [T]his process of identifying and responding to hazards in the wild implicates the NPS's broader policy mandates to balance access with conservation and safety.

*Id.* at 1137 (quoting the district court; citations omitted).

The same reasoning applies here. As noted above, the purpose of the Third Pole Project was not public safety; it was improving water, riparian and aquatic resources. *Pl. Ex. P,* Dkt. 18-19. Although the identification of tree hazards was included as a line item on the ranger checklist, the project did not specify what should happen if hazardous trees were identified. Moreover, as already discussed, deciding what to do about any hazardous trees that were identified – including deciding whether to warn potential campers – would require the Forest Service to balance public safety concerns, environmental effects, and budgetary constraints. This is the sort of policy balancing the discretionary function exception was designed to protect. *See Merando*, 517 F.3d at 172; *Autery*, 992 F.2d at 1531.

Finally, the Ninth Circuit has consistently held that decisions relating to the training of employees involve policy judgments of the type Congress intended the discretionary function exception to shield. *Kelly*, 241 F.3d at 762-63; *Vickers v. United States,* 228 F.3d 944, 950 (9th Cir. 2000). The Court, therefore, finds that the government's decisions regarding training employees to identify hazardous trees are protected by the discretionary function exception.

For all these reasons, the Court concludes that the discretionary function exception immunizes the government from the plaintiff's action. The Court will therefore dismiss this action for lack of subject-matter jurisdiction.

# ORDER

**IT IS ORDERED:**

1. The United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 17) is **GRANTED** and this action is **DISMISSED FOR LACK OF JURISDICTION.**

2. Judgment will be entered separately in accordance with Federal Rule of Civil Procedure 58.

DATED: December 30, 2014

B. Lynn Winmill
Chief Judge
United States District Court